# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 21-CIV-22280 BLOOM/OTAZO-REYES

EMIN GÜN SIRER,

      Plaintiff,

v.

EMRE AKSOY,

      Defendant.

_____/

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dated: March 15, 2023

Justin Sher (*pro hac vice*)
Justin Gunnell (*pro hac vice*)
Wesley Erdelack (*pro hac vice*)
**SHER TREMONTE LLP**
90 Broad St., 23rd Floor
New York, NY 10004
Tel: (212) 202-2600
Email: jsher@shertremonte.com
Email: jgunnell@shertremonte.com
Email: werdelack@shertremonte.com

Matthew Leto
Fla. Bar ID # 014504
**LETO LAW FIRM**
201 South Biscayne Blvd., Suite 2700
Miami, FL 33131
Tel: (305) 341-3155
Fax: (305) 397-1168
Email: mleto@letolawfirm.com

*Attorneys for Plaintiff Emin Gün Sirer*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PLAINTIFF'S PROPOSED FINDINGS OF FACT .................................................................... 1

    A.   Procedural History ............................................................................................................ 1

    B.   The Parties and Defendant's Defamatory Statements ...................................................... 2

    C.   Plaintiff Experiences the Consequences of the Defendant's Defamation .......................... 3

    D.   Turkey's Campaign of Repression Against FETÖ Members ............................................. 6

    E.   Effects of Defendant's Defamation on the Price of AVAX ............................................... 8

PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW ........................................................... 13

    A.   Applicable Law on Damages ........................................................................................... 13

    B.   General Damages ............................................................................................................. 14

    C.   Special Damages .............................................................................................................. 16

    D.   Punitive damages ............................................................................................................. 18

    E.   Prejudgment Interest ....................................................................................................... 21

CONCLUSION ........................................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Argonaut Ins. Co. v. May Plumbing Co.,*
474 So. 2d 212 (Fla. 1985)...................................................................................... 22

*Army Aviation Heritage Found. & Museum, Inc. v. Buis,*
504 F. Supp. 2d 1254 (N.D. Fla. 2007)............................................................. 15, 17

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,*
752 F.3d 82 (1st Cir.2014)....................................................................................... 18

*Buchanan v. Bowman*,
820 F.2d 359 (11th Cir. 1987) ................................................................................... 2

*Carroll v. TheStreet.com, Inc.*,
No. 11-CV-81173, 2012 WL 13134547 (S.D. Fla. May 25, 2012)......................... 20

*Coton v. Televised Visual X-Ography, Inc.*,
740 F. Supp. 2d 1299 (M.D. Fla. 2010)................................................................... 17

*Destefano v. Adventist Health Sys. Sunbelt,*
973 So. 2d 492 (Fla.5th DCA 2007)......................................................................... 16

*FindWhat Inv. Grp. v. FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011) ................................................................................ 18

*Fla. Pub. Utilities Co. v. Wester*,
150 Fla. 378, 7 So. 2d 788 (1942)............................................................................ 14

*Hoch v. Rissman, Weisberg, Barrett,*
742 So. 2d 451 (Fla.5th DCA 1999)......................................................................... 19

*In re Ocwen Fin. Corp. Sec. Litig.*,
No. 14-81057-CIV-WPD, 2017 WL 11680400 (S.D. Fla. June 21, 2017) ............. 18

*Kleiman v. Wright,*
No. 18-CV-80176, 2022 WL 705971 (S.D. Fla. Mar. 9, 2022)............................... 22

*Lawnwood Med. Ctr., Inc. v. Sadow,*
43 So. 3d 710 (Fla.4th DCA 2010)........................................................................... 21

*Lundquist v. Alewine*,
397 So. 2d 1148 (Fla.5th DCA 1981)....................................................................... 20

iii

*Lustig v. Stone*,
No. 15-20150-CIV, 2015 WL 13326350 (S.D. Fla. Aug. 18, 2015) ........................... 15, 17, 22

*ME Tech., Inc. v. Brownstein*,
No. 20-61508-CIV, 2020 WL 7211694 (S.D. Fla. Nov. 13, 2020) ......................................... 14

*NITV, L.L.C. v. Baker*,
61 So. 3d 1249 (Fla.4th DCA. 2011) .................................................................................... 16

*Rety v. Green*,
546 So. 2d 410 (Fla.3rd DCA 1989) ..................................................................................... 22

*Sapssov v. Health Mgmt. Assocs., Inc.*,
608 F. App'x 855 (11th Cir. 2015) ........................................................................................ 18

*Saunders Hardware Five & Ten, Inc. v. Low*,
307 So. 2d 893 (Fla.3d DCA 1974) ...................................................................................... 20

*Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*,
No. 05-21113-CIV, 2007 WL 3232274 (S.D. Fla. Oct. 31, 2007) ........................................ 14

*Sterling Sav. Ass'n v. Ryan*,
751 F. Supp. 871 (E.D. Wash. 1990), 959 F.2d 241 (9th Cir. 1992)...................................... 17

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)............................................................................................................... 14

*United States v. Schiff*,
602 F.3d 152 (3d Cir.2010)................................................................................................... 18

**Statutes**

Fla. Stat. 55.03 ..................................................................................................................... 22

**Other Authorities**

19A Fla. Jur 2d *Defamation and Privacy* § 127 ......................................................................... 15

*Quantitative Proof of Reputational Harm*,
15 Fordham J. Corp. & Fin. L. 567........................................................................................ 17

iv

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

Plaintiff Emin Gün Sirer respectfully submits the following proposed findings of fact and conclusions of law for the Court's consideration.

### A.    Procedural History

On June 22, 2021, Plaintiff Emin Gün Sirer commenced this action by filing a complaint (the "Complaint") in the United States District Court for the Southern District of Florida. ECF No. 1. The Complaint alleges a single cause of action for defamation *per se* against Defendant Emre Aksoy. *Id.* On August 17, 2021, Defendant, through counsel, filed a Motion to Dismiss for Failure to State a Claim. ECF No. 16. On October 22, 2021, the Court denied Defendant's motion in its entirety. ECF No. 23. Defendant filed his Answer to the Complaint on November 3, 2021. ECF No. 26. Defendant's counsel subsequently moved to withdraw as attorney for Defendant, and their motion was granted. ECF Nos. 44, 50.

On June 21, 2022, Plaintiff moved for sanctions against Defendant on the grounds that Defendant willfully failed comply with the Court's orders and failed to comply with his discovery obligations. ECF No. 53. On August 8, 2022, the Court granted Plaintiff's motion and directed the Clerk of Court to strike the Defendant's answer and affirmative defenses, and to enter default against Defendant. ECF No. 55. On the same day, the Clerk of Court entered default against Defendant. ECF No. 57.

On September 9, 2022, Plaintiff moved pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 7.1(a)(2) for entry of a Default Final Judgment against Defendant. ECF No. 64. On October 17, 2022, the Court granted Plaintiff's motion as to liability and directed the parties appear for an evidentiary hearing pursuant to Federal Rule of Civil Procedure 55(b)(2) to determine Plaintiff's damages. ECF No. 67. On February 13, 2023, the Court held an evidentiary hearing on damages. ECF No. 96.

1

### B.    The Parties and Defendant's Defamatory Statements

Plaintiff Dr. Emin Gün Sirer is a computer scientist and entrepreneur. February 13, 2023 Hearing Transcript ("Tr.") at 11:21, 12:10-12.[1] Dr. Sirer is the co-founder and CEO of AVA Labs, Inc. ("Ava Labs"), a blockchain software development company. Tr. at 12:16-18, 13:4-5. Ava Labs develops a variety of blockchain-based software products, including a blockchain-based software development platform called "Avalanche." *Id.* at 13:7. The Avalanche platform has a native cryptocurrency token called "AVAX," which allows users to utilize, secure, and update the blockchain, and may also serve as a store of value. *Id.* at 16:22-17:9. Prior to founding Ava Labs, Dr. Sirer was a professor of computer science at Cornell University for nearly 20 years. *Id.* at 11:19-12:8.

Defendant Emre Aksoy holds himself out as a "product marketing expert" and "crypto thought leader." Compl. ¶ 16.[2] Defendant promotes various cryptocurrency assets and provides cryptocurrency trading advice to his followers through various social media platforms, including YouTube and Telegram. *Id.* ¶ 17. At the time of the events giving rise to the instant case, Mr. Aksoy had approximately 180,000 subscribers to his YouTube channel and 100,000 subscribers to his Telegram channel. *Id.* ¶ 18. Some issuers of cryptocurrency assets pay Mr. Aksoy to promote their cryptocurrencies on his channel. *Id.* ¶ 19; Tr. at 20:24-21:4.

On or about February 17, 2021, the Defendant posted a video to his "Kripto Emre" YouTube channel. In this video, Mr. Aksoy falsely stated that Plaintiff was a member of the Fethullah Terrorist Organization ("FETÖ"), a group that has been designated as a terrorist

---

[1] The February 13, 2023 Hearing Transcript is attached hereto as Exhibit A.
[2] By his default, Defendant admits the well-pleaded allegations in the Complaint. *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (effect of default judgment is that Defendant "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established"). The Complaint is attached hereto as Exhibit B.

organization in Turkey. *Id.* ¶ 20. A third party paid Defendant to depress the value of AVAX, which he did by making these defamatory statements. *See* Dkt. No. 64-4 (Plaintiff's First Set of Requests For Admission) at ¶¶ 21, 24.[3]

Though Defendant briefly took down the YouTube video containing these defamatory remarks in response to a request from one of the crypto asset companies he was paid to promote, he subsequently re-published the same defamatory statements on his Twitter account on February 19. Compl. ¶¶ 25, 26; Tr. at 76:2-3. On February 13, 2021 he also tweeted to his followers that they should "Short AVAX." Compl. ¶ 24; Tr. at 18:19-20. In a Telegram post published March 17, 2021, he again urged his social media followers to short AVAX. Compl. ¶ 29.

## C.    Plaintiff Experiences the Consequences of the Defendant's Defamation

Plaintiff Dr. Sirer testified that he became aware of the Defendant's YouTube video and its defamatory statements in February 2021 after they were brought to his attention by a colleague. Tr. at 18:7-8.  Dr. Sirer testified that the publication of Defendant's remarks had an immediate and significant impact on Ava Labs, particularly amongst its Turkish user base, which made up approximately twenty percent of the Ava Labs user community at the time. Tr. at 16:16-19. Dr. Sirer testified that Ava Labs' Turkish social media channels were quickly filled with inquiries regarding the Defendant's allegations that Dr. Sirer was a member of FETÖ. Tr. at 19:1-2. Dr. Sirer testified that he has personally continued to receive questions from members of

---

[3] As detailed more fully in Plaintiff's Motion For Default Judgment and Memorandum of Law in Support Thereof Against Defendant Emre Aksoy, ECF. No. 64 at 2 n.2, Defendant failed to respond to Plaintiff's First Set of Requests for Admission, and consequently the matter contained therein has been deemed admitted pursuant to Federal Rule of Civil Procedure 36. Plaintiff's First Set of Requests for Admission are attached hereto as Exhibit C.

the Avalanche community asking about his alleged membership of FETÖ for over a year after Defendant immediately made the allegations. Tr. at 19:18-20.

In response to the statements, Dr. Sirer consulted with other Ava Labs executives concerning inquiries that Ava Labs had received concerning his alleged terrorist connections. The company ultimately issued a statement denying the allegations. Tr. at 21:15-21.

Dr. Sirer also testified regarding his experiences traveling to Turkey in the aftermath of Defendant's comments. He testified that he frequently traveled to Turkey in the period after the Defendant's allegations—between ten and twelve times in total—to take care of his ailing father and sister. Tr. at 26:2-14. *Id.* Dr. Sirer testified that this experience was a "nightmare," and that each time he traveled to Turkey in the wake of Defendant's comments he feared that he would be questioned, arrested and imprisoned by Turkish security when entering the country. Tr. at 26:9-21.

Dr. Sirer also testified that he had to change his approach to his personal security and privacy in response to Defendant's allegations. Dr. Sirer testified that he deactivated direct messaging on social media. Tr. at 22:9-11. While he had previously enjoyed interacting with the public and discussing his work, he found that he was no longer able to maintain an open channel to the public due to the wave of negative sentiment following Defendant's comments. Tr. at 21:23-22:11. He also took measures to hide his location, including by removing the name plate on his parents' apartment in Istanbul and by deleting all addresses from internet websites and delivery services, out of fear that irate members of the public might attempt to track him down

where he lived. Tr. at 22:9-23:10. Dr. Sirer testified that the increased security expenditures incurred in the aftermath of Defendant's comments totaled ███████. Sealed Tr. at 3:14-15.[4]

Dr. Sirer also testified as to the impact that Defendant's defamatory statements had on Ava Labs and on the AVAX token, as he noticed a significant drop in the price of AVAX following the defendant's statements. Tr. at 18:13-22. Dr. Sirer testified that this decline harmed his personal finances because he holds ████████████████████████████████ ████████████████████████████████, shortly after the Defendant published the defamatory statements. Sealed Tr. at 3:21-4:4. Dr. Sirer testified that the Avalanche community was unhappy with the losses to the value of AVAX that followed Defendant's allegations, and that the growth of the company slowed. Tr. at 29:25-30:5. Dr. Sirer testified that he had to spend significant effort and energy over a period of months to calm the Avalanche user base's fears that the company was somehow tied to a terrorist organization. *Id.* Dr. Sirer testified that the remarks led to a "huge change in sentiment" against Ava Labs. Tr. at 18:23. Ava Labs had previously been the "darling of the crypto community" with an up-and-coming AVAX token; after the publication of Defendant's allegations, potential users "[took] a step back and [started] to ask questions." Tr. at 18:24-19:1. Dr. Sirer testified that that fighting these allegations "became an ongoing part of our life." Tr. at 25:3-8.

Dr. Sirer testified that another impact of Defendant's statements on Ava Labs was the company's business dealings. He testified that Ava Labs encountered unexplained difficulties and delays in a project it had been negotiating with the Turkish Central Bank. Tr. at 24:10-19. Dr. Sirer testified that though Ava Labs eventually managed to repair its relationship with the

---

[4] At the February 13, 2023 evidentiary hearing, the Plaintiff moved to submit certain portions of Dr. Sirer's testimony under seal, and the Court granted his motion. The transcript of that sealed testimony ("Sealed Tr.") is attached hereto as Exhibit D.

bank, it took considerable time and effort to do so. *Id.* Dr. Sirer testified that in general, it was difficult to him to estimate the full effect of the Defendant's remarks on his business relationships in Turkey because Turkish counterparties would typically "quietly step back and keep their distance" from someone alleged to be a FETÖ member, without explicitly tendering the allegations a reason for their behavior. Tr. at 24:2-6.

### D.    Turkey's Campaign of Repression Against FETÖ Members

At the February 13, 2023 evidentiary hearing the Court also heard testimony from Dr. Halil Yenigun, Plaintiff's expert on Turkish politics, who explained the heightened risks of persecution in Turkey to individuals with actual or perceived associations with the FETÖ. Dr. Yenigun testified that Turkey was formerly a democracy prior to the ascension of its current leader, Recep Tayyip Erdoğan. Tr. at 37:1-6. While Erdoğan was democratically elected, his government and the political regime in Turkey has become steadily more autocratic. Tr. at 37:8-14.

Dr. Yenigun testified that the key turning point in Turkey's turn towards authoritarianism was a failed coup attempt in June of 2016. He explained that on July 15th, 2016, a number of military officers attempted to overthrow the Turkish government. This coup attempt was foiled by pro-government forces the following day. Tr. 38:7-15. Dr. Yenigun testified that in the immediate aftermath of this failed coup attempt, the Turkish authorities held the Gulen movement (which they called Fethullah Terrorist organization, or "FETÖ") responsible for the attempted coup. Tr. at 38:21-25. The Gulen movement is a religious community and movement inspired by cleric Fethullah Gulen, a Turkish expatriate who has lived in the United States since the early 2000s. Tr. at 39:6-9.

Dr. Yenigun testified that, in the wake of the 2016 coup attempt, President Erdoğan declared a state of emergency and began ruling by decree. Tr. at 40:13-21. Dr. Yenigun testified

that this transition to rule by decree was accompanied by a series of investigations, detentions, and prosecutions directed at individuals accused of having ties to FETÖ and other disfavored political groups. Tr. at 41:13-19. Dr. Yenigun testified that by July 15, 2020, the Turkish Government had by its own accounting investigated 600,000 people, arrested over 250,000 individuals, and placed 25,000 people in custody for suspected association with FETÖ. Tr. at 41:23-42:3. Dr. Yenigun testified that individuals swept up in the wave of persecution that followed the coup were frequently subject to prolonged detention without access to due process or habeas rights. Tr. at 43:14-17. The Turkish regime's actions also targeted enterprises run by suspected FETÖ members, seizing over 880 businesses and arresting the stockholders of businesses with suspected FETÖ ties. Tr. at 42:8-14.

As Dr. Yenigun testified, these arrests and convictions of suspected dissidents were frequently made on the basis of very little evidence. Tr. at 41:13-16. Individuals employed at Gulenist institutions, subscribers to Gulenist newspapers, and individuals who had a Gulen-related app on their phones were all considered suspicious. Tr. 42:20-43:6. Secret witness testimony also frequently served as the basis for arrest and detention. Tr. at 43:7-9.

Dr. Yenigun testified that some U.S. nationals had been targeted for persecution in Turkey for suspected ties to FETO. He testified that Turkey issued an arrest warrant for Henri Barkey, an American academic who had visited Istanbul shortly before the coup attempt. Tr. at 44:19-22. One piece of evidence that was cited as the basis for the warrant was that a piece of embroidery left at his hotel contained the word "Pennsylvania;" this was taken as evidence of his involvement in the coup plot because Fethullah Gulen resides in Pennsylvania. Tr. at 44:23-45:2. Dr. Yenigun also cited the example of Serkan Golge, a Turkish-American NASA scientist who was arrested and convicted while vacationing in Turkey on the basis of secret testimony from a

family member and his possession of a U.S. one-dollar bill. Tr. at 45:19-25. Dr. Yenigun testified that the 2016 coup plotters supposedly signaled membership in the plot to each other by showing U.S. one-dollar bills; subsequently, the possession of these bills was taken as evidence that individuals were involved with the coup. Tr. at 46:7-13.

Dr. Yenigun also testified regarding actions that the Turkish regime has taken against actual or suspected FETÖ affiliates living abroad. Dr. Yenigun testified that the Turkish regime, acting through the state-run news agency and other pro-government media organizations, has targeted suspected dissidents living abroad for surveillance and harassment. Tr. at 47:10-17. Dr. Yenigun cited the example of Hakan Sukur, a former soccer player who later took refuge in the United States; state-directed Turkish media tracked Mr. Sukur to a cafeteria he established in Palo Alto, California and published his home address and pictures in Turkish newspapers under the headline "The Traitor is in Hiding." Tr. at 47:18-48:1.

E.     **Effects of Defendant's Defamation on the Price of AVAX**

At the February 13, 2023 hearing, the court heard testimony from Dr. Sanjay Unni, the Plaintiff's expert as to financial analysis and damages. Dr. Unni testified that he performed three analyses to determine the economic impact of the Defendant's defamatory statements on the price of AVAX. Tr. at 58:22-23.

Dr. Unni first testified regarding a "market trends" analysis that he had performed comparing the price trends of the AVAX token with the price trends of competitor tokens in the wake of the defamation. Tr. at 58:22-59:3. Dr. Unni conducted this analysis by tracking the price of AVAX from a period shortly before publication of the defamatory statements until approximately three months after their publication. Tr. at 59:22-60:3. Dr. Unni then identified five competitor tokens issued by competing blockchain platforms, which he selected by choosing platforms which sought to provide similar technical benefits to those provided by the Avalanche

platform—i.e., platforms that can host decentralized finance applications and that employ proof-of-stake mechanisms to validate new transactions. Tr. at 60:18-23.

Dr. Unni testified that, having identified a basket of comparable tokens, he then tracked the prices of these competitor tokens over the same time period that he had analyzed AVAX's price to calculate the cumulative returns of the tokens during the relevant period. Tr. 63:9-13; Pl's Ex. 8.[5] Dr. Unni observed that the cumulative returns of AVAX were consistently negative in the period following the defamation compared to the comparator tokens, whose returns substantially rose in value over the same period. Tr. at 68:11-17. Dr. Unni testified that, in fact, each of the five competitor tokens ended that period with positive returns and that AVAX was the only token that ended with negative returns. Tr. at 68:25-69:1; *see also* Pl's Ex. 13.[6]

Dr. Unni also testified regarding a second, "more rigorous" analysis of AVAX's price performance he performed. Tr. at 59:4. Dr. Unni testified that this second approach was a commonly used type of regression analysis called an "event study." Tr. at 69:25. Dr. Unni testified that the purpose of the event study analysis he conducted was to determine how the observed returns of the AVAX token statistically related to the returns of the broader cryptocurrency market and to the returns of competing cryptocurrency tokens. Tr. at 70:3-12.  To conduct this analysis, Dr. Unni testified that—consistent with standard event study methodology—he created an index of the five competitor tokens he had selected in his market trends analysis and assigned each competitor token a weight corresponding to its share of the token market. Tr. at 70:13-23. Dr. Unni testified that he then ran a regression analysis using the returns of AVAX, a basket representing the performance of the broader cryptocurrency market,

---

[5] Attached hereto as Exhibit E.
[6] Attached hereto as Exhibit F.

and the weighted index of competitor tokens, to see whether AVAX behaved differently than the markets generally and its closest competitors. Tr. at 70:10-12; Pl's Ex. 9.[7]

Dr. Unni testified that by performing this event study analysis, he identified a period in which AVAX experienced statistically significant abnormal returns relative to the cryptocurrency market as a whole and relative to the index of competitor tokens he had created. Tr. at 72:11-14; Pl's Ex. 10.[8] He testified that the abnormal returns he observed represent the component in AVAX's returns that cannot be explained by reference to broader market factors and thus are attributable to the Defendant's defamatory statements. Tr. at 73:17-25.

Dr. Unni testified that the first date on which AVAX's abnormal returns became statistically significant was February 22, 2021. Tr. at 75:23-25. The period of observed statistically significant abnormal returns continued until March 9, 2021. *See* Pl's Ex. 14.[9] Dr. Unni testified that that February 22, 2021 was significant because it was the first active trading day after the Defendant's defamatory statements were re-introduced to the market via a social media post on Friday, February 19, 2021. Tr. at 75:21-76:3. The timing of the statistically significant abnormal returns beginning on February 22 was thus consistent with those returns having been triggered by the incorporation of defamatory information into the price of AVAX. Tr. at 76:9-12. Dr. Unni testified that other than the defamatory statements by the Defendant, he was not able to identify any developments specific to AVAX in this period which would explain the abnormal returns that he observed beginning on February 22. Tr. at 76:13-18.

Dr. Unni testified that using this analysis, he was able to construct a model showing the difference between AVAX's actual performance and its expected performance but-for the

---

[7] Attached hereto as Exhibit G.
[8] Attached hereto as Exhibit H.
[9] Attached hereto as Exhibit I.

negative impact of the defamatory statements. Tr. at 79:11-15. Dr. Unni testified that, from an economic perspective, the economic loss suffered by Dr. Sirer is the difference between the but-for price and the actual performance, which amounted to $11.65 per token. *See* Tr. at 78:24-79:10; Pl's Ex. 15.[10] Dr. Unni also suggested that a more conservative measure of loss could be calculated by taking the difference between the price of AVAX prior to the defamatory statement and the price of AVAX at the time when the token ceased to show statistically abnormal returns on March 9, 2021. Using this conservative measure, the per-token loss suffered by Dr. Sirer was $2.09 per token. Tr. at 80:5.

Dr. Unni also testified that he performed an additional analysis, which he described as an "exponential decay analysis," as a way to confirm whether the results of his event study analysis were reliable. Tr. at 81:3-7. Dr. Unni testified that this exponential decay analysis provided a "sanity check" or "sensitivity check" on the results of the event study analysis he had performed. Tr. at 82:20-83:1.

Dr. Unni testified that this analysis was premised on the economic principle that market participants observing new information about a financial asset—such as the defamation at issue in the instant suit—would have an incentive to trade on that information before that information becomes incorporated into the price. Tr. 81:12-22. Dr. Unni testified that research on market structure indicates the price impact of negative information will be greatest when the negative (or defamatory) information is first introduced to the market, but that price impact will then decline exponentially over time before being fully incorporated into the price. Tr. at 82:15-17.

Dr. Unni testified that the first step of his analysis was to quantify the initial price impact on AVAX when the defendant's defamation first became observable to market participants. Dr.

---

[10] Attached hereto as Exhibit J.

Unni testified that he assumed that the initial price impact was the average daily decline observed on February 17, 18, 19, and 22, 2021. *See* Tr. at 84; Pl's Ex. 11.[11] Using this methodology—which Dr. Unni described as being "conservative from the perspective of the Plaintiff" because it included several days when the price did not decline and a period in which the defamatory statements were withdrawn—Dr. Unni modeled the incremental continuing impact of the defamation as an exponentially decaying series of price effects lasting from February 23rd to March 9th. Tr. 84:11-12.

Dr. Unni testified that he then modeled two scenarios to determine the total price impact of the defamatory statements, which differed only in the rate of price impact decay. In the first scenario, the total impact was $2.03 per token. Tr. at 85:12-19. In the second scenario, which assumed a slightly slower rate of price impact decay, the total impact was $2.46 per token. Tr. at 85:20-86:1; *see also* Pl's Ex. 16.[12]

Dr. Unni testified that the economic harm to the value of AVAX that he identified in his analyses was ongoing. Tr. at 89:20-90:3. Dr. Unni testified that to the best of his knowledge, the defamatory statements have not been definitively corrected by a source that market participants would consider authoritative (e.g., if the Defendant retracted them or an agency regarded as authoritative by the market denied or refuted the statements). Tr. at 89:12-19. Absent such a definitive correction, economic principles suggest that the price at which AVAX trades subsequent to the defamation will always be lower than the price which otherwise would have prevailed absent the defamation. Tr. at 89:20-90:3.

---

[11] Attached hereto as Exhibit K.
[12] Attached hereto as Exhibit L.

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

The Court's October 17, 2023 order on Plaintiff's motion for default final judgment granted the motion as to liability. *See* ECF No. 67 at 4. The remaining matter before the Court is to determine Plaintiff's damages. *Id.*

### A.    Applicable Law on Damages

Under Florida law, a wronged party is not required to demonstrate the amount of damages sustained with mathematical certainty. As the Supreme Court of Florida held, "[t]he law guarantees every person a remedy when he has been wronged . . . [w]hen the wrong is shown it becomes the duty of court and jury to apply a test that will reasonably compensate the person wronged rather than one that makes it impossible to do so." *Fla. Pub. Utilities Co. v. Wester*, 150 Fla. 378, 382, 7 So. 2d 788, 790 (1942). *See also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person . . . it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."). Where the plaintiff's damages are difficult to quantify, "the damages rule must be flexibly applied so as to provide fair compensation under the circumstances of the specific case." *Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *11 (S.D. Fla. Oct. 31, 2007).

Florida courts also recognize the principle that, in calculating damages, "the risk of uncertainty in calculating damages falls on the wrongdoer." *ME Tech., Inc. v. Brownstein*, No. 20-61508-CIV, 2020 WL 7211694, at *5 (S.D. Fla. Nov. 13, 2020), *report and recommendation adopted*, No. 20-61508-CIV, 2020 WL 7187740 (S.D. Fla. Dec. 7, 2020). *See also Story Parchment*, 282 U.S. at 563 ("The wrongdoer is not entitled to complain that [damages] cannot

13

be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.").

### B.    General Damages

Under Florida law a court may award general damages to the victim of defamation to compensate him for the reputational damage and emotional anguish caused by the defamation. *See Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007) (under Florida law, injured party may recover general damages "resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering"); 19A Fla. Jur 2d *Defamation and Privacy* § 127 ("When a libel is calculated to humiliate or injure a person's reputation or character, the law infers general damages for injuries to his or her feelings and reputation."). A plaintiff may recover such general damages "even if there is no evidence that assigns an actual dollar value to the injury." *Lustig v. Stone*, No. 15-20150-CIV, 2015 WL 13326350, at *2 (S.D. Fla. Aug. 18, 2015), *report and recommendation adopted*, No. 15-20150-CIV, 2015 WL 13326383 (S.D. Fla. Dec. 7, 2015), *aff'd*, 679 F. App'x 743 (11th Cir. 2017). Because the reputational and emotional harms addressed though general 'damages are inherently difficult to quantify, Florida courts have recognized that "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence." *Army Aviation*, 504 F. Supp. 2d at 1260.

Here, Plaintiff's testimony at the evidentiary hearing demonstrates the considerable reputational harm that the Defendant's defamatory accusations have caused. Dr. Sirer testified that for over a year since the Defendant's allegations were first published, he has had to expend time and effort attempting to put the allegations to rest and to clear his name. Though Dr. Sirer has publicly denied the allegations, he has consistently received questions from current and

potential customers regarding his perceived membership in a terrorist group. Dr. Sirer also credibly testified that the remarks have affected his ability to openly participate in public life as he had prior to the Defendant's remarks; he has had to close off his open social media messaging, hire security for his public appearances, and anonymize his internet presence as a result of these comments.

Dr. Sirer is also entitled to general damages for the mental anguish he has suffered from the Defendant's remarks. As Dr. Sirer testified at the hearing, he experienced anxiety and fear during his frequent trips to Turkey because of his justified concern that he would be arrested and detained by the Turkish authorities upon entry as a result of Defendant's allegations that he was a member of FETÖ. As Dr. Yenigun's testimony demonstrated, these fears were not fanciful. Turkey has engaged in an open campaign of repression against individuals with perceived or actual ties to FETÖ. The Turkish regime has frequently targeted individuals—including U.S. nationals—for prosecution on the basis of vindictive rumor and secret testimony, and has left detainees with few due process protections to defend themselves.

On the basis of this evidence presented at the evidentiary hearing, an award of $750,000 in general damages is appropriate to compensate Plaintiff for the reputational and emotional damage caused by Defendant's assertion that Plaintiff is affiliated with a terrorist organization. Courts have affirmed awards of similar amounts in other cases, including cases involving defamatory statements that were less severe and impactful than the false accusation at issue here. *See NITV, L.L.C. v. Baker*, 61 So. 3d 1249, 1254 (Fla.4th DCA. 2011) (affirming $250,000 award against defendant for publishing defamatory messages suggesting that plaintiff, who marketed a polygraph-like "truth verification" system to law enforcement agencies, had provided false information to law enforcement agencies using plaintiff's system); *Destefano v. Adventist*

*Health Sys. Sunbelt*, 973 So. 2d 492, 494 (Fla.5th DCA 2007) (affirming $1,000,000 jury award to plaintiff as compensation for defamatory remarks that plaintiff inappropriately kissed his mother and improperly laid with her in her hospital bed); *Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp. 2d 1299, 1314 (M.D. Fla. 2010) (awarding $100,000 to plaintiff as compensation for humiliation she suffered as a result of having her photograph used in connection with a pornographic movie and related marketing materials); *Stone*, 2015 WL 13326350, at *4 (awarding $500,000 in general damages against defaulting defendant for injury to plaintiff's personal and professional reputation and mental anguish caused by defendant's defamatory accusations that plaintiff lawyer dishonestly extorted clients).

### C.    Special Damages

In addition to general damages, special damages are also available under Florida law for victims of defamation. Unlike general damages, which are implied by law, a plaintiff must show that special damages "proximately resulted from the defamation." *Army Aviation,* 504 F. Supp. at 1259.

In the context of defamation actions, "[e]conomists have advocated, and courts have accepted[,] a decline in the stock price of a publicly traded defamed corporation as evidence of special damages." Meiring De Villers, *Quantitative Proof of Reputational Harm*, 15 Fordham J. Corp. & Fin. L. 567, 567-68; *see also Sterling Sav. Ass'n v. Ryan*, 751 F. Supp. 871, 877 (E.D. Wash. 1990), *vacated on other grounds*, 959 F.2d 241 (9th Cir. 1992) (holding that decline in stock price constituted strong evidence of reputational damage to plaintiff corporation). Economists and legal scholars have each argued that event studies are the preferred method for analyzing how the decline in a company's stock price represents the decline in a company's goodwill that is proximately caused by the release of damaging information about the company. De Villers at 613 ("A well-designed event study can . . . isolate the effect of a defamatory

publication from the effects of other factors, in order to provide an estimate of the portion of the defamed company's share price change solely due to the defamation.").

An event study is "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir.2010) (internal quotation marks and alteration omitted). Courts in the Eleventh Circuit have frequently relied upon event studies to ascertain loss causation and to estimate the damage caused to financial asset holders by the disclosure of damaging information. *See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011) (noting that "event studies are a common method of establishing loss causation, used routinely in the academic literature to determine whether the release of particular information has a significant effect" on the price of a security (internal quotation marks omitted)); *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 867 (11th Cir. 2015) (event study is the "preferred method for proving loss causation" (internal quotation makes omitted) (quoting *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86 (1st Cir.2014)); *In re Ocwen Fin. Corp. Sec. Litig.*, No. 14-81057-CIV-WPD, 2017 WL 11680400, at *4 (S.D. Fla. June 21, 2017) (noting that event studies are the "standard methodology" used to establish loss causation and damages in cases alleging that disclosure of negative information depressed the value of a security).

Dr. Unni provided the court with testimony regarding the event study he performed analyzing the performance of AVAX in the period following the dissemination of the Defendant's defamatory remarks concerning Dr. Sirer. Dr. Unni concluded that AVAX's abnormal price decline during this period was statistically significant; his analysis indicated that the economic losses to Dr. Sirer attributable to the Defendant's defamation amounted to $11.65

17

per token. Dr. Unni's testimony also offered an alternative measure of damages relying on the same methodology but using the difference between the pre-defamation price of AVAX and the price of AVAX at the end of the period of abnormal returns; according to this measure, which Dr. Unni described as "conservative," the loss to Plaintiff was $2.09 per token. Dr. Unni's testimony also provided an alternative methodology as a check on the event study analysis indicating that the per-token losses attributable to Defendant's defamation, calculated on premises that were very conservative from the Plaintiff's perspective, were $2.03 or $2.46 per token.

Dr. Sirer testified that he currently holds ████ AVAX tokens[13] allocated to him. The Court should therefore find that Plaintiff is conservatively entitled to $2.09 in special damages per token, or ████.[14] Plaintiff has established that he is also entitled to ████ in special damages representing his out-of-pocket costs for increased security in response in response to the Defendant's defamation.

### D.    Punitive damages

Florida law permits the imposition of punitive damages on a defendant who acts with malice. "In a suit for libel or slander, although no special damage may have been proved, upon some proof of the malicious character of the publication, a plaintiff may recover punitive damages, the purpose of which is not to compensate but rather to serve as a deterrent to others

---

[13] As set forth in the authority above, the economic harm to Dr. Sirer's tokens is properly characterized as special damages. However, even if such damages were characterized as general damages, because general damages are presumed in "slander *per se* actions," any distinction in how these damages are classified would have no impact on the ultimate damages award. *See Hoch v. Rissman, Weisberg, Barrett,* 742 So. 2d 451, 457 (Fla.5th DCA 1999).

[14] As Dr. Unni testified, the price impact of the Defendant's defamation continues to be incorporated in the price of AVAX, because the defamatory statements have not been affirmatively corrected by a source regarded as authoritative by market participants. *See* Tr. at 89:12-90:3.

inclined to commit a similar offense." *Saunders Hardware Five & Ten, Inc. v. Low*, 307 So. 2d 893, 894 (Fla.3d DCA 1974); *see also Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2012 WL 13134547, at *4 (S.D. Fla. May 25, 2012) ("It is well-established that . . . presumed and punitive damages in a defamation action are recoverable only if liability is based on proof of actual malice, i.e. knowledge of falsity or reckless disregard for the truth.").

The Court has previously held that the allegations in the Complaint, when taken as true, plausibly state that the Defendant acted with actual malice and thus could justify the imposition of punitive damages. *See* ECF No. 23 at 7-8 (holding that allegations in Complaint that "Defendant was aware, when he published his YouTube video in which he made the statements, that those statements were false, and that he knew that they would cause substantial harm to Plaintiff" were sufficient to plausibly state that Defendant acted with actual malice). By his default, Defendant has now admitted the truth of those allegations. Thus, the Court should find that the imposition of punitive damages on Defendant is appropriate here. The Court is independently empowered to award punitive damages in this matter because Defendant's statements that Plaintiff was member of a terrorist organization are actionable per se. *See Lundquist v. Alewine*, 397 So. 2d 1148, 1149 (Fla.5th DCA 1981) ("When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause like injury, such language is actionable per se."); Florida allows imposition of punitive damages in cases of defamation per se. *See Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla.4th DCA), *review denied*, 36 So. 3d 84 (Fla. 2010) ("The singular protection afforded by Florida law to personal reputation in actions for defamations per se is further seen by the fact that punitive damages may be the primary relief in a cause of action for defamation per se").

Here, the Defendant's statements and the circumstances of those statements justify the imposition of punitive damages to punish and deter the kind of malicious behavior perpetrated by the Defendant in this case. Defendant knowingly and deliberately spread the defamatory and dangerous falsehood that the Plaintiff was a member of a terrorist organization as part of his campaign to promote a competing blockchain token. These falsehoods placed Dr. Sirer and his family at an increased risk of surveillance, arrest, and indefinite detainment when he was visiting Turkey. As a Turkish national, Mr. Aksoy would be fully aware that these statements associating Dr. Sirer with a terrorist group carried a grievous risk to Plaintiff's reputation, to Ava Labs, and to Plaintiff's personal safety. Indeed, that was the Defendant's purpose; Mr. Aksoy spread these dangerous lies for no other reason than personal gain, as he was paid to depress the value of AVAX at the behest of a third party. In fact, these statements did do significant harm to Plaintiff's personal reputation and to the reputation of Ava Labs, including by depressing the value of AVAX.

For these reasons, the Court should assess an award of $2,000,000 in punitive damages against Defendant. *See Sadow*, 43 So. 3d at 725 (affirming $5,000,000 punitive damages award against hospital for "willfully and maliciously destroying the reputation" of a physician with whom it had an employment dispute); *Rety v. Green*, 546 So. 2d 410, 421 (Fla.3rd DCA 1989) (holding that $2,500,000 punitive damages award would be appropriate against defendant who maliciously ruined plaintiff's reputation and business through false claims of antisemitism); *Stone*, 2015 WL 13326350 at *6 (awarding $1,000,000 in punitive damages against defendant who "set out to destroy [plaintiff's] legal and business careers by branding him as a criminal actor, racketeer, thief, and murderer, among many other things."). Many of these punitive awards would be substantially higher if calculated in today's dollars adjusted for inflation.

### E.      Prejudgment Interest

Under Florida law, prejudgment interest is "another element of pecuniary damages . . .

The purpose of the award of prejudgment interest is to make the plaintiff whole from the date of

the loss once the [factfinder] determines the defendant's liability for damages and their amount."

*Kleiman v. Wright,* No. 18-CV-80176, 2022 WL 705971, at *2–3 (S.D. Fla. Mar. 9, 2022)

(calculating pre-judgement beginning on date of tort). "[I]t is a purely ministerial duty of the trial

judge or clerk of the court to add the appropriate amount of interest to the principal amount of

damages awarded in the verdict." *Argonaut Ins. Co. v. May Plumbing Co.,* 474 So. 2d 212, 215

(Fla. 1985).

Here, Plaintiff is entitled to pre-judgment interest on his damages at the rate of 5.52%

from March 9, 2021, the date which according to Dr. Unni, was the first date of the end of the

period of abnormal returns attributable to the defamatory statements upon which the economic

harm to Plaintiff was first reducible to an actual loss. Tr. at 78:12-14. Thus, the pre-judgment

interest amount that the Court should award to Plaintiff is ███████, based on total damages of

███████ *See* Fla. Stat. 55.03.[15]

### CONCLUSION

The Court should enter an order awarding Plaintiff $750,000 in general damages,

███████ in special damages, $2,000,000 in punitive damages, and ███████ in

prejudgment interest for a total of ███████

We respectfully request, to the extent possible, in the Court's final opinion and order on

this application that the Court avoid specifically disclosing information previously filed under

seal.

---

[15] Taking the daily rate of interest, .0151233%, interest on Plaintiff's damages accrued at the rate
of ███████ a day for 675 days, totaling ███████.

Dated: March 15, 2023

/s/ *Justin Sher*          /
Justin Sher (*pro hac vice*)
Justin Gunnell (*pro hac vice*)
Wesley Erdelack (*pro hac vice*)
**SHER TREMONTE LLP**
90 Broad St., 23rd Floor
New York, NY 10004
Tel: (212) 202-2600
Email: jsher@shertremonte.com
Email: jgunnell@shertremonte.com
Email: werdelack@shertremonte.com

Matthew Leto
Fla. Bar ID # 014504
**Leto Law Firm**
201 South Biscayne Blvd., Suite 2700
Miami, FL 33131
Tel: (305) 341-3155
Fax: (305) 397-1168
Email: mleto@letolawfirm.com

*Attorneys for Plaintiff Emin Gün Sirer*