**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-22280-BLOOM/Otazo-Reyes**

EMIN GÜN SIRER,

      Plaintiff,

v.

EMRE AKSOY,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following an evidentiary hearing on damages held on February 13, 2023. Plaintiff appeared with counsel and presented testimony and trial exhibits. ECF No. [96]. Neither Defendant nor counsel for Defendant appeared. *Id.* The Court has previously entered an order granting Plaintiff's Motion for Default Judgment as to Defendant's liability. ECF No. [67]. Plaintiff filed a redacted version of his Proposed Findings of Fact and Conclusions of Law, with attached exhibits, ECF No. [100]; and an unredacted version under seal of the Proposed Findings of Fact and Conclusions of Law, ECF No. [104]. The Court has considered the testimony of the witnesses, the exhibits admitted into evidence, Plaintiff's Proposed Findings and Conclusions of Law, the record in this case, the applicable law, and is otherwise fully advised. The Court makes the following findings of fact and conclusions of law.

### I.  FINDINGS OF FACT

### A.  Procedural History

On June 22, 2021, Plaintiff Dr. Emin Gün Sirer commenced this action by filing a complaint (the "Complaint"). ECF No. [1]. The Complaint alleges a single cause of action for defamation *per se* against Defendant Emre Aksoy. *Id.* On August 17, 2021, Defendant, through counsel, filed his

Motion to Dismiss for Failure to State a Claim. ECF No. [16]. On October 22, 2021, the Court denied Defendant's motion in its entirety. ECF No. [23]. Defendant filed his Answer to the Complaint on November 3, 2021. ECF No. [26]. Defendant's counsel subsequently moved to withdraw as attorney for Defendant, and Defendant's counsel's motion was granted. ECF Nos. [44] and [50].

On June 21, 2022, Plaintiff moved for sanctions against Defendant on the grounds that Defendant willfully failed to comply with the Court's Orders and failed to comply with his discovery obligations. ECF No. [53]. On August 8, 2022, the Court granted Plaintiff's motion and directed the Clerk of Court to strike Defendant's Answer and affirmative defenses, and to enter default against Defendant. ECF No. [55]. On the same day, the Clerk of Court entered default against Defendant. ECF No. [57].

On September 9, 2022, Plaintiff moved pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 7.1(a)(2) for entry of a Default Final Judgment against Defendant. ECF No. [64]. On October 17, 2022, the Court granted Plaintiff's motion as to liability and directed the parties to appear for an evidentiary hearing pursuant to Federal Rule of Civil Procedure 55(b)(2) to determine Plaintiff's damages. ECF No. [67]. On February 13, 2023, the Court held an evidentiary hearing on damages. ECF No. [96].

### B. The Parties

Plaintiff is a computer scientist and entrepreneur. February 13, 2023 Hearing Transcript ("Tr.") at 11:21, 12:10-12, ECF No. [97]. Plaintiff is the co-founder and CEO of AVA Labs, Inc. ("Ava Labs"), a "blockchain software" development company. Tr. at 12:16-18, 13:4-5. Ava Labs develops a variety of blockchain software products, including a blockchain software-based development platform called "Avalanche." *Id.* at 13:7. The Avalanche platform has a native "cryptocurrency token" called "AVAX," which allows users to utilize, secure, and update the

blockchain, and may also serve as a store of value. *Id.* at 16:22-17:9.[1] Prior to founding Ava Labs, Plaintiff was a professor of computer science at Cornell University for nearly 20 years. *Id.* at 11:19-12:8.

Defendant holds himself out as a "product marketing expert" and "crypto thought leader." Compl. ¶ 16.[2] Defendant promotes various cryptocurrency assets and provides cryptocurrency trading advice to his followers through various social media platforms, including YouTube and Telegram. *Id.* ¶ 17. At the time of the events giving rise to the instant case, Defendant had approximately 180,000 subscribers to his YouTube channel and 100,000 subscribers to his Telegram channel. *Id.* ¶ 18. Some issuers of cryptocurrency assets pay Defendant to promote their cryptocurrencies on his channel. *Id.* ¶ 19; *see also* Tr. at 20:24-21:4.

### C. Defendant's Defamatory Statements

On or about February 17, 2021, the Defendant posted a video to his "Kripto Emre" YouTube channel. In this video, Defendant falsely stated that Plaintiff was a member of the Fethullah Terrorist Organization ("FETÖ"), a group that has been designated as a terrorist organization in Turkey. *Id.* ¶ 20.

Though Defendant briefly took down the YouTube video containing these defamatory remarks in response to a request from one of the crypto asset companies he was paid to promote, he

---

[1] The Complaint describes AVAX as a "crypto-asset" but does not define the term crypto-asset. *See* ECF No. 1 ¶ 14. Judge Cote of the United States District Court for the Southern District of New York has explained,

> Crypto-assets, which are also called "cryptocurrency" or "tokens", are decentralized digital commodities that rely on a technology called the "blockchain." A blockchain is a decentralized electronic ledger that allows for secure and reliable tracking of the ownership and transfer of each individual unit of the crypto-asset.

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 329-30 (S.D.N.Y. 2021).

[2] By his default, Defendant admits the well-pleaded allegations in the Complaint. *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (effect of default judgment is that defendant "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established").

subsequently re-published the same defamatory statements on his Twitter account on February 19, 2021. Compl. ¶¶ 25, 26; Tr. at 76:2-3. On February 13, 2021 he also tweeted to his followers that they should "short $AVAX." Compl. ¶ 24; Tr. at 18:19-20. In a Telegram post published March 17, 2021, he again urged his social media followers to short AVAX. Compl. ¶ 29.

### D. Effect of Defendant's Defamation on Plaintiff's Reputation

Plaintiff testified that he became aware of the Defendant's YouTube video and its defamatory statements in February 2021, after the statements were brought to Plaintiff's attention by a colleague. Tr. at 18:7-8. Plaintiff testified that the publication of Defendant's remarks had an immediate and significant impact on Ava Labs, particularly amongst its Turkish user base, which made up approximately twenty percent of the Ava Labs user community at the time. Tr. at 16:16-19. Plaintiff testified that Ava Labs' Turkish social media channels were quickly filled with inquiries regarding the Defendant's allegations that Plaintiff was a member of FETÖ. Tr. at 19:1-2. Plaintiff testified that he had personally continued to receive questions from members of the Avalanche community asking about his alleged membership in FETÖ for over a year after Defendant made the remarks. Tr. at 19:18-20.

In response to the statements, Plaintiff consulted with other Ava Labs executives concerning inquiries that Ava Labs had received about his alleged terrorist connections. Tr. at 21:15-21. The company ultimately issued a statement denying the allegations. *Id.*

Plaintiff testified about his experiences traveling to Turkey in the aftermath of Defendant's comments. He testified that he frequently traveled to Turkey in the period after the Defendant's allegations—between ten and twelve times in total—to take care of his ailing father and his sister. Tr. at 26:2-14. Plaintiff testified that this experience was a "nightmare," and that each time he traveled to Turkey in the wake of Defendant's comments, he feared that he would be questioned, arrested and imprisoned by Turkish security when entering the country. Tr. at 26:9-21.

4

Plaintiff testified that he had to change his approach to his personal security and privacy in response to Defendant's allegations. Plaintiff deactivated direct messaging on social media. Tr. at 22:9-11. While he had previously enjoyed interacting with the public and discussing his work, he was no longer able to maintain an open channel to the public due to the wave of negative sentiment following Defendant's comments. Tr. at 21:23-22:11. He also took measures to hide his location, including removal of the name plate on his parents' apartment in Istanbul and deletion of all addresses from internet websites and delivery services, out of fear that irate members of the public would track him down where he lived. Tr. at 22:9-23:10. The increased security expenditures incurred in the aftermath of Defendant's comments totaled up to $300,000.00. ECF No. [102] at 3:14-15 ("Sealed Tr.").[3]

Plaintiff also testified about the impact Defendant's defamatory statements had on Ava Labs and on the AVAX token, as he noticed a significant drop in the price of AVAX following the defendant's statements. Tr. at 18:13-22. Plaintiff testified that this decline harmed his personal finances because [Redacted] and he had sold [Redacted] AVAX tokens in May and June 2021. Sealed Tr. at 3:21-4:4. Plaintiff testified that the Avalanche community was unhappy with the losses to the value of AVAX following Defendant's statements and the growth of the company slowed. Tr. at 29:25-30:5. Plaintiff had to spend significant effort and energy over a period of months to calm the Avalanche user base's fears that the company was tied to a terrorist organization. *Id.* The Defendant's remarks led to a "huge change in sentiment" against Ava Labs. Tr. at 18:23. Ava Labs had previously been the "darling of the crypto community" with an up-and-coming AVAX token; after the publication of Defendant's statements, potential users "[took] a step back and [started] to ask

---

[3] At the February 13, 2023 evidentiary hearing, the Plaintiff moved to submit certain portions of Plaintiff's testimony under seal, and the Court granted his motion.

questions." Tr. at 18:24-19:1. Plaintiff testified that fighting those allegations "became an ongoing part of our life." Tr. at 25:3-8.

Another impact of Defendant's statements on Ava Labs was the company's business dealings. Ava Labs encountered unexplained difficulties and delays in a project it had been negotiating with the Turkish Central Bank. Tr. at 24:10-19. Although Ava Labs eventually managed to repair its relationship with the Turkish Central Bank, it took considerable time and effort to do so. *Id.* Plaintiff testified that in general, it was difficult to him to estimate the full effect of the Defendant's remarks on his business relationships in Turkey because Turkish counterparties would typically "quietly step back and keep their distance" from someone alleged to be a FETÖ member, without explicitly tendering the allegations as a reason for their behavior. Tr. at 24:2-6.

### E. Turkey's Campaign of Repression Against FETÖ Members

At the February 13, 2023 evidentiary hearing, the Court also heard testimony from Dr. Halil Yenigun, Plaintiff's expert on Turkish politics, who explained the heightened risks of persecution in Turkey to individuals with actual or perceived associations with the FETÖ. Yenigun testified that Turkey was formerly a democracy prior to the ascension of its current leader, Recep Tayyip Erdoğan. Tr. at 37:1-6. Although Erdoğan was democratically elected, his government and the political regime in Turkey has become steadily more autocratic. Tr. at 37:8-14.

Yenigun testified that the key event in Turkey's turn toward authoritarianism was a failed coup attempt in July of 2016. He explained that on July 15th, 2016, several military officers attempted to overthrow the Turkish government. Tr. 38:4-8. This coup attempt was foiled by pro-government forces the following day. Tr. 38:7-15. In the immediate aftermath of this failed coup attempt, the Turkish authorities held the Gulen movement (which they call FETÖ) responsible for the attempted coup. Tr. at 38:21-25. The Gulen movement is a religious community and movement inspired by

cleric Fethullah Gulen, a Turkish expatriate who has lived in the United States since the early 2000s. Tr. at 39:6-9.

In the wake of the 2016 coup attempt, President Erdoğan declared a state of emergency and began ruling by decree. Tr. at 40:13-21. This transition to rule by decree was accompanied by a series of investigations, detentions, and prosecutions directed at individuals accused of having ties to FETÖ and other disfavored political groups. Tr. at 41:13-19. By July 15, 2020, the Turkish Government had by its own accounting investigated 600,000 people, arrested over 250,000 individuals, and placed 25,000 people in custody for suspected association with FETÖ. Tr. at 41:23-42:3. Individuals swept up in the wave of persecution that followed the coup were frequently subject to prolonged, unlawful detention. Tr. at 43:14-17. The Turkish regime's actions also targeted enterprises run by suspected FETÖ members, seizing over 880 businesses and arresting the stockholders of businesses with suspected FETÖ ties. Tr. at 42:8-14.

As Yenigun testified, these arrests and convictions of suspected dissidents were frequently made on the basis of very little evidence. Tr. at 41:13-16. Individuals employed at Gulenist institutions, subscribers to Gulenist newspapers, and individuals who had a Gulen-related app on their phones were all considered suspicious. Tr. 42:20-43:6. Secret witness testimony also frequently served as the basis for arrest and detention. Tr. at 43:7-9.

Some U.S. nationals had been targeted for persecution in Turkey for suspected ties to FETÖ. Turkey issued an arrest warrant for Henri Barkey, an American academic who had visited Istanbul shortly before the coup attempt. Tr. at 44:19-22. One piece of evidence that was cited as the basis for the warrant was that a piece of embroidery left at his hotel contained the word "Pennsylvania;" this was taken as evidence of his involvement in the coup plot because Fethullah Gulen resides in Pennsylvania. Tr. at 44:23-45:2. Yenigun also cited the example of Serkan Golge, a Turkish-American NASA scientist who was arrested and convicted while vacationing in Turkey on the basis

of secret testimony from a family member and his possession of a U.S. one-dollar bill. Tr. at 45:19-25. The 2016 coup plotters supposedly signaled membership in the plot to each other by showing U.S. one-dollar bills; subsequently, the possession of these bills was taken as evidence that individuals were involved with the coup. Tr. at 46:7-13.

Yenigun also testified regarding actions that the Turkish regime has taken against actual or suspected FETÖ affiliates living abroad. The Turkish regime, acting through the state-run news agency and other pro-government media organizations, has targeted suspected dissidents living abroad for surveillance and harassment. Tr. at 47:10-17. Yenigun cited the example of Hakan Sukur, a former soccer player who later took refuge in the United States; state-directed Turkish media tracked Mr. Sukur to a cafeteria he established in Palo Alto, California and published his home address and pictures in Turkish newspapers under the headline "The Traitor is in Hiding." Tr. at 47:18-48:1.

### F.  Effects of Defendant's Defamation on the Price of AVAX

The Court heard testimony from Dr. Sanjay Unni, the Plaintiff's expert as to financial analysis and damages. Unni testified that he performed three analyses to determine the economic impact of the Defendant's defamatory statements on the price of AVAX. Tr. at 58:22-23.

Unni first testified regarding a "market trends" analysis that he had performed comparing the price trends of the AVAX token with the price trends of competitor tokens in the wake of the defamation. Tr. at 58:22-59:3. Unni conducted this analysis by tracking the price of AVAX from a period shortly before publication of the defamatory statements until approximately three months after their publication. Tr. at 59:22-60:3. Unni then identified five competitor tokens issued by competing blockchain platforms, which he selected by choosing platforms which sought to provide similar technical benefits to those provided by the Avalanche platform—i.e., platforms that, like Avalanche,

"can host decentralized finance applications and that employ proof-of-stake" mechanisms to validate new transactions. Tr. at 60:18-23.

Having identified a basket of comparable tokens, Unni then tracked the prices of these competitor tokens over the same time period that he had analyzed AVAX's price to calculate the cumulative returns of the tokens during the relevant period. Tr. 63:9-13; *see also* ECF No. [100-5]. Unni observed that the cumulative returns of AVAX were consistently negative in the period following the defamation compared to the comparator tokens, whose returns substantially rose in value over the same period. Tr. at 68:11-17. Unni testified that each of the five competitor tokens ended that period with positive returns and AVAX was the only token that ended with negative returns. Tr. at 68:25-69:1; *see also* ECF No. [100-6].

Unni also testified regarding a second, "more rigorous" analysis of AVAX's price performance that he performed. Tr. at 59:4. This second approach was a commonly used type of regression analysis called an "event study." Tr. at 69:25. The purpose of the event study was to determine how the observed returns of the AVAX token statistically related to the returns of the broader cryptocurrency market and to the returns of competing cryptocurrency tokens. Tr. at 70:3-12. To conduct this analysis, Unni created an index of the five competitor tokens he had selected in his market trends analysis and assigned each competitor token a weight corresponding to its share of the token market. Tr. at 70:13-23. Unni then ran a regression analysis using the returns of AVAX, a basket representing the performance of the broader cryptocurrency market, and the weighted index of competitor tokens, to see whether AVAX behaved differently than the markets generally and its closest competitors. Tr. at 70:10-12; *see also* ECF No. [100-7].

By performing this event study analysis, Unni identified a period in which AVAX experienced statistically significant abnormal returns relative to the cryptocurrency market as a whole and relative to the index of competitor tokens he had created. Tr. at 72:11-14; *see also* ECF No. [100-

8]. The abnormal returns he observed represent the component in AVAX's returns that cannot be explained by reference to broader market factors and thus are attributable to the Defendant's defamatory statements. Tr. at 73:17-25.

Unni testified that the first date on which AVAX's abnormal returns became statistically significant was February 22, 2021. Tr. at 75:23-25. The period of observed statistically significant abnormal returns continued until March 9, 2021. *See* ECF No. [100-9]. The day of February 22, 2021 was significant because it was the first active trading day after the Defendant's defamatory statements were re-introduced to the market via a social media post on Friday, February 19, 2021. Tr. at 75:21-76:3. The timing of the statistically significant abnormal returns beginning on February 22 was thus consistent with those returns having been triggered by the incorporation of defamatory information into the price of AVAX. Tr. at 76:9-12. Other than the defamatory statements by the Defendant, Unni was not able to identify any developments specific to AVAX in this period which would explain the abnormal returns that he observed beginning on February 22. Tr. at 76:13-18.

Using his analysis, Unni was able to construct a model showing the difference between AVAX's actual performance and its expected performance but-for the negative impact of the defamatory statements. Tr. at 79:11-15. From an economic perspective, the economic loss suffered by Plaintiff is the difference between the but-for price and the actual performance, which amounted to [Redacted] per token. *See* Tr. at 78:24- 79:10; *see also* ECF No. [100-10]. A more conservative measure of loss could be calculated by taking the difference between the price of AVAX prior to the defamatory statement and the price of AVAX at the time when the token ceased to show statistically abnormal returns on March 9, 2021. Tr. at 80:5. Using this conservative measure, the per-token loss suffered by Plaintiff was [Redacted] per token. *Id.*

Unni performed an additional analysis, which he described as an "exponential decay analysis," as a way to confirm whether the results of his event study analysis were reliable. Tr. at

81:3-7. This exponential decay analysis provided a "sanity check" or "sensitivity check" on the results of the event study analysis he had performed. Tr. at 82:20-83:1. This analysis was premised on the economic principle that market participants observing new information about a financial asset—such as the defamation at issue in the instant suit—would have an incentive to trade on that information before that information becomes incorporated into the price. Tr. at 81:12-22. Research on market structure indicates the price impact of negative information will be greatest when the negative (or defamatory) information is first introduced to the market, but that price impact will then decline exponentially over time before being fully incorporated into the price. Tr. at 82:15-17.

The first step of Unni's analysis was to quantify the initial price impact on AVAX when the defendant's defamation first became observable to market participants. The initial price impact was the average daily decline observed on February 17, 18, 19, and 22, 2021. *See* Tr. at 84; *see also* ECF No. [100-11]. Using this methodology, Unni modeled the incremental continuing impact of the defamation as an exponentially decaying series of price effects lasting from February 23rd to March 9th. Tr. at 84:11-12.

Unni then modeled two scenarios to determine the total price impact of the defamatory statements, which differed only in the rate of price impact decay. In the first scenario, the total impact was [Redacted] per token. Tr. at 85:12-19. In the second scenario, which assumed a slightly slower rate of price impact decay, the total impact was [Redacted] per token. Tr. at 85:20-86:1; *see also* ECF No. [100-12].

The economic harm to the value of AVAX that Unni identified in his analyses was ongoing. Tr. at 89:20-90:3. The defamatory statements have not been corrected by a source that market participants would consider authoritative (e.g., if the Defendant retracted them or an agency regarded as authoritative by the market denied or refuted the statements). Tr. at 89:12-19. Absent such a definitive correction, economic principles suggest that the price at which AVAX trades subsequent

to the defamation will always be lower than the price which otherwise would have prevailed absent the defamation. Tr. at 89:20-90:3.

## II. CONCLUSIONS OF LAW

The Court's October 17, 2023 Order on Plaintiff's Motion for Default Final Judgment granted the motion as to liability. *See* ECF No. [67] at 4. The remaining matter before the Court is to determine Plaintiff's damages. *Id.*

### A. Applicable Law on Damages

Under Florida law, a wronged party is not required to demonstrate the amount of damages sustained with mathematical certainty. As the Supreme Court of Florida held, "[t]he law guarantees every person a remedy when he has been wronged . . . [w]hen the wrong is shown it becomes the duty of court and jury to apply a test that will reasonably compensate the person wronged rather than one that makes it impossible to do so." *Fla. Pub. Utilities Co. v. Wester*, 150 Fla. 378, 382 (1942). *See also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person . . . it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."). Where the plaintiff's damages are difficult to quantify, "the damages rule must be flexibly applied so as to provide fair compensation under the circumstances of the specific case." *Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *11 (S.D. Fla. Oct. 31, 2007).

Florida courts also recognize the principle that, in calculating damages, "the risk of uncertainty in calculating damages falls on the wrongdoer." *ME Tech., Inc. v. Brownstein*, No. 20-61508-CIV, 2020 WL 7211694, at *5 (S.D. Fla. Nov. 13, 2020), *report and recommendation adopted*, No. 20-61508-CIV, 2020 WL 7187740 (S.D. Fla. Dec. 7, 2020); *see also Story Parchment*,

282 U.S. at 563 ("The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.").

###### B. General Damages

Under Florida law, a court may award general damages to the victim of defamation to compensate him for the reputational damage and emotional anguish caused by the defamation. *See Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007) (under Florida law, an injured party may recover general damages "resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering"); 19A FLA. JUR. 2D DEFAMATION AND PRIVACY § 127 ("When a libel is calculated to humiliate or injure a person's reputation or character, the law infers general damages for injuries to his or her feelings and reputation."). A plaintiff may recover such general damages "even if there is no evidence that assigns an actual dollar value to the injury." *Lustig v. Stone*, No. 15-20150-CIV, 2015 WL 13326350, at *2 (S.D. Fla. Aug. 18, 2015), *report and recommendation adopted*, No. 15-20150-CIV, 2015 WL 13326383 (S.D. Fla. Dec. 7, 2015), *aff'd*, 679 F. App'x 743 (11th Cir. 2017). Because the reputational and emotional harms addressed through general damages are inherently difficult to quantify, Florida courts have recognized that "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence." *Army Aviation*, 504 F. Supp. 2d at 1260.

Here, Plaintiff's testimony demonstrates that Plaintiff is entitled to general damages for the considerable reputational harm that the Defendant's defamatory accusations have caused. Plaintiff testified that for over a year since the defamatory statements were first published, Plaintiff has had to expend time and effort attempting to put the allegations to rest and to clear his name. Though Plaintiff has publicly denied the allegations, he has consistently received questions from current and

potential customers regarding his perceived membership in a terrorist group. Plaintiff also credibly testified that the remarks have affected his ability to openly participate in public life as he had prior to the Defendant's remarks; he has had to close off his open social media messaging, hire security for his public appearances, and anonymize his internet presence as a result of these comments.

Plaintiff is also entitled to general damages for the mental anguish he has suffered due to the Defendant's remarks. Plaintiff experienced anxiety and fear during his frequent trips to Turkey because of his justified concern that he would be arrested and detained by the Turkish authorities upon entry as a result of Defendant's allegations that he was a member of FETÖ. As Yenigun's testimony demonstrated, those fears were not fanciful.

Turkey has engaged in an open campaign of repression against individuals with perceived or actual ties to FETÖ. The Turkish regime has frequently targeted individuals—including U.S. nationals—for prosecution on the basis of vindictive rumors and secret testimony, and has left detainees with few due process protections to defend themselves.

On the basis of this evidence, an award of $750,000.00 in general damages is appropriate to compensate Plaintiff for the reputational and emotional damage caused by Defendant's assertion that Plaintiff is affiliated with a terrorist organization. *See Stone*, 2015 WL 13326350, at *4 (awarding $500,000.00 in general damages against defaulting defendant for injury to plaintiff's personal and professional reputation and mental anguish caused by defendant's defamatory accusations posted on the internet that included those labelling plaintiff lawyer as a "terrorist[] and criminal[]" "as vicious as ISIS terrorists"); *Marron v. Moros*, No. 21-23190-CIV, 2023 WL 357592, at *5 (S.D. Fla. Jan. 23, 2023) (awarding $1,000,000.00 in damages against defaulting defendants where the defendants published through internationally available media defamatory statements, including that plaintiff was a "financial terrorist," among other things); *Osio v. Moros*, No. 21-20706-CIV, 2022 WL 4280499, at *10 (S.D. Fla. Sept. 5, 2022), *report and recommendation adopted*, No. 1:21-CV-20706, 2022 WL

4271920 (S.D. Fla. Sept. 15, 2022) (recommending awarding $1,000,000.00 in compensatory damages against defaulting defendants where statements made by a defendant on Venezuelan state television that plaintiff, among other things, was plotting to assassinate Venezuelan president Nicolas Maduro).

### C. Special Damages

In addition to general damages, special damages are also available under Florida law for victims of defamation.[4] Special damages are "actual, out of pocket losses; that is, realized or liquidated loss." *Grayson v. No Labels, Inc.*, 601 F. Supp. 3d 1251, 1257 (M.D. Fla. 2022); *see also Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999) (quoting W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 128 at 971 (5th ed. 1984)) (explaining that the "special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales"). Although a "realized or unliquidated" pecuniary loss is not defined in Florida law in the context of a defamation action, in the context of federal tax law, the Fifth Circuit has described a "realized loss" as a loss in pecuniary value to the purchaser of an asset who pays for that asset with cash or other assets. *See Hammond Iron Co. v. Comm'r*, 122 F.2d 4, 6 (5th Cir. 1941) (describing the purchase of a certain sum of the stock of a corporation with cash or other assets of the corporation as a "realized loss").[5]

In addition to "specific lost sales," special damages include actual expenditures by plaintiff to repair his or her reputation. *Daniels v. HSN, Inc.*, No. 818CV3088T24JSS, 2020 WL 533927, at *6 (M.D. Fla. Feb. 3, 2020); *see also Thermolife International LLC v. Vital Pharmaceuticals Inc.*, 2020 WL 409594, at *2 (S.D. Fla. Jan. 24, 2020) (finding that "expenses incurred to counteract the

---

[4] In addition, unlike general damages, which are implied by law, a plaintiff must show that special damages "proximately resulted from the defamation." *Army Aviation,* 504 F. Supp. 2d at 1259.

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit issued prior to October 1, 1981.

disparaging effect" of the false statements are special damages); *Jameson Land Co., LLC v. Mosaic Fertilizer, LLC*, 2016 WL 7206122, at *3 (M.D. Fla. Feb. 5, 2016) (finding special damages are sufficiently alleged by plaintiff that it had incurred expenses to counteract a false publication). By contrast, the mere decline in the value of an asset, such as the value of a plaintiff's stock, is not a *realized* pecuniary loss that can support a special damages award. *Salit*, 742 So. 2d at 388; *see also id.* (quoting W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 128 at 971 (5th ed.1984)) (explaining that the decline in a plaintiff's land's market value is an item of general damages, not special damages because "[t]he chief characteristic of special damages is a realized loss"). This is because such a decline is not realized absent evidence that a plaintiff had sold the asset at a loss on account of that decline. *See Salit*, 742 So. 2d at 388.

Here, Plaintiff offered testimony that he has spent up to $300,000.00 on implementing security measures following Defendant's defamatory statements. Sealed Tr. 3:7-15. Thus, Plaintiff has shown that he has suffered that dollar amount in actual pecuniary damages due to actual economic harm caused by the defamatory statements.

Plaintiff also offered expert testimony on an event study that Unni performed showing a decline in the price of the crypto-asset AVAX in order to show that Plaintiff suffered special damages. An event study is "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010) (internal quotation marks and alteration omitted). In its Proposed Findings of Facts and Conclusions of Law, Plaintiff asserts that a decline in the stock price of a publicly traded corporation is evidence of special damages. EFC No. [100] at 20-21 (citing Meiring De Villers, *Quantitative Proof of Reputational Harm*, 15 FORDHAM J. CORP. & FIN. L. 567, 575 (2010); *see also Langdon v. Hillside Coal & Iron Co.*, 41 F. 609, 609 (C.C.S.D.N.Y. 1890); *Diamond v. Oreamuno*, 24 N.Y.2d 494, 499 (1969)). Plaintiff reasons that the decline in the price of AVAX in the three-

16

month period following the defamatory statements, as shown by Unni's event study and Unni's two other confirmatory analyses, similarly provides evidence of special damages.

However, Plaintiff has not shown he suffered any "realized loss" on account of the depreciation in value of AVAX in publicly traded crypto-asset markets. In other words, there is no evidence, for example, that Plaintiff sold AVAX at a loss. Absent evidence of such sale, Plaintiff's event analysis study, and his confirmatory market trends analysis and exponential decay analysis, cannot show a realized loss. As such, Plaintiff has not demonstrated that he suffered special damages due to the depreciated value of AVAX, even if Defendant's defamatory statements caused that depreciation. *See Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1269 (S.D. Fla. 2004) ("Plaintiffs have not alleged that they sold their shares in Duty Free at a loss. Thus, Plaintiffs' mere allegation that the value of their stock in Duty Free (via their interest in DFA Holdings) depreciated does not constitute a *realized* loss required for special damages.") (emphasis in original); *see also Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1343 n.4 (M.D. Fla. 2003). Accordingly, the Court will not award special damages on Plaintiff's unrealized loss due to the decline in the value of AVAX.

A question remains, however, whether Plaintiff may recover special damages on losses due to his sale of AVAX tokens in May and June of 2021. The answer depends on whether the losses from that sale are proximately caused by Defendant's defamatory statements. In other words, the issue is whether Plaintiff sold AVAX tokens to pay for Plaintiff's increased security measures or to counteract Defendant's statements within the Avalanche community. Plaintiff's testimony makes plain that he spent significant effort and energy over a period of months to assuage the Avalanche user base's fears that his company was associated with FETÖ. Tr. at 29:25-30:5. In addition, Unni testified that the price of Avax declined conservatively by [Redacted] on account of Defendant's defamatory statements over the prior three-month period. Tr. 73:23-80:5. Plaintiff also testified that he sold [Redacted] AVAX tokens in May and June 2021. Sealed Tr. at 3:21-4:4. To the extent

Case No. 21-cv-22280-BLOOM/Otazo-Reyes

Plaintiff sold those AVAX tokens in order to counteract the defamatory statements in the Avalanche community, or to pay for increased security measures, the Court could find that Plaintiff suffered a realized loss on account of the defamatory statements. However, Plaintiffs' testimony does not indicate that he sold the AVAX tokens in order to pay for his efforts to counteract the statements or to ensure his family's security. Accordingly, Plaintiff's request for special damages with respect to his sale of AVAX tokens fails for lack of a showing of proximate causation. *See Army Aviation*, 504 F. Supp. 2d at 1259 (quoting *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977)) ("it is necessary for a plaintiff to show his special damages proximately resulted from the defamation").

Accordingly, the Court finds Plaintiff has shown $300,000.00 in special damages.

### D.  Punitive Damages

Florida law permits the imposition of punitive damages on a defendant who acts with malice. "In a suit for libel or slander . . . upon some proof of the malicious character of the publication, a plaintiff may recover punitive damages, the purpose of which is not to compensate but rather to serve as a deterrent to others inclined to commit a similar offense." *Saunders Hardware Five & Ten, Inc. v. Low*, 307 So. 2d 893, 894 (Fla. 3d DCA 1974); *see also Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2012 WL 13134547, at *4 (S.D. Fla. May 25, 2012) ("It is well-established that . . . presumed and punitive damages in a defamation action are recoverable only if liability is based on proof of actual malice, i.e. knowledge of falsity or reckless disregard for the truth.").

The Court has previously held that the allegations in the Complaint, taken as true, plausibly state that the Defendant acted with actual malice and thus could justify the imposition of punitive damages. *See* ECF No. [23] at 7-8 (holding that allegations in Complaint that "Defendant was aware, when he published his YouTube video in which he made the statements, that those statements were false, and that he knew that they would cause substantial harm to Plaintiff" were sufficient to

18

plausibly state that Defendant acted with actual malice). By his default, Defendant has now admitted the truth of those allegations.

Thus, the Court finds the imposition of punitive damages on Defendant is appropriate here. The Court is independently empowered to award punitive damages in this matter because Defendant's statements that Plaintiff was a member of a terrorist organization are actionable *per se*. *See Lundquist v. Alewine*, 397 So. 2d 1148, 1149 (Fla. 5th DCA 1981) ("When the words published concerning a person tend to degrade him, *bring him into ill repute*, destroy confidence in his integrity, or cause like injury, such language is actionable per se.") (emphasis added). Florida allows imposition of punitive damages in cases of defamation *per se. See Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. 4th DCA), *review denied*, 36 So. 3d 84 (Fla. 2010) ("The singular protection afforded by Florida law to personal reputation in actions for defamations per se is further seen by the fact that punitive damages may be the primary relief in a cause of action for defamation per se").

Here, the Defendant's statements and the circumstances of those statements justify the imposition of punitive damages to punish and deter the kind of malicious behavior perpetrated by the Defendant. Defendant knowingly and deliberately spread the defamatory and dangerous falsehood that the Plaintiff was a member of a terrorist organization as part of his campaign to promote a competing blockchain token. Those falsehoods placed Plaintiff and his family at an increased risk of surveillance, arrest, and indefinite detainment when he was visiting Turkey. In fact, these statements significant harmed Plaintiff's personal reputation.

For those reasons, the Court assesses an award of $2,000,000 in punitive damages against Defendant. *See Lawnwood Med. Ctr.*, 43 So. 3d at 725 (affirming $5,000,000 punitive damages award against hospital for "willfully and maliciously destroying the reputation" of a physician with whom it had an employment dispute); *Rety v. Green*, 546 So. 2d 410, 421 (Fla. 3rd DCA 1989) (holding that $2,500,000 punitive damages award would be appropriate against defendant who

maliciously ruined plaintiff's reputation and business through false claims of antisemitism); *Lustig*, 2015 WL 13326350 at \*6 (awarding $1,000,000 in punitive damages against defendant who "set out to destroy [plaintiff's] legal and business careers by branding him as a criminal actor, racketeer, thief, and murderer, among many other things.").

### E.  Prejudgment Interest

Under Florida law, prejudgment interest is available to compensate a party for the wrongful deprivation of property, and to help make an injured party whole. *Lipsig v. Ramlawi*, 760 So. 2d 170, 192 (Fla. 3rd DCA 2000) (citing *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 214-15 (Fla. 1985)). Prejudgment interest is "merely another element of pecuniary damages." *Argonaut*, 474 So. 2d at 214. Accordingly, prejudgment interest is not calculated against punitive damages. S*ee id.* at 215 ("when a verdict liquidates damages on a plaintiff's *out-of-pocket, pecuniary losses*, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of *that loss*") (emphasis added); *see also Christenson & Assocs. v. Palumbo-Tucker*, 656 So. 2d 266, 267 (Fla. 4th DCA 1995) (explaining that prejudgment interest is calculated from the amount of compensatory damages awarded to the plaintiff). Moreover, prejudgment interest is not available on non-economic damages, such as the damages to reputation. *Id.*; *see also Alvarado v. Rice*, 614 So. 2d 498, 499 (Fla. 1993) (holding that a party is entitled to prejudgment interest when it is determined that party had suffered "actual, out-of-pocket loss" at some date prior to the entry of the judgment). Prejudgment interest is calculated from the date of the loss until the date of final judgment. *See Kleiman v. Wright*, No. 18-CV-80176, 2022 WL 705971, at \*2-4 (S.D. Fla. Mar. 9, 2022) (calculating prejudgment interest from date defendant committed conversion to the date of the final judgment). "Courts apply the statutory judgment interest rate from the date of loss or entitlement under [Fla. Stat. §] 55.03 for purposes of

Case No. 21-cv-22280-BLOOM/Otazo-Reyes

calculation of pre-judgment interest." *Genser v. Reef Condo. Ass'n*, 100 So. 3d 760, 762 (Fla. 4th DCA 2012). The rate of interest was 4.81% as of January 1, 2021.[6]

The Court has concluded that Plaintiff suffered $300,000.00 in actual out-of-pocket losses. *Lipsig*, 760 So. 2d at 192. The date of the loss, i.e., the final date when Defendant's defamatory statements caused the abnormal returns of AVAX, is March 9, 2021. ECF No. [100] at 25; *see also Lipsig*, 760 So. 2d at 192 ("Prejudgment interest . . . is available for actual out-of-pocket losses, and the claim for such losses becomes liquidated at the time the verdict fixes the date and amount of the loss"). The date of final judgment is April 28, 2023. Accordingly, prejudgment interest amounts to $31,681.76.[7]

### III. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows.

1. As adjudged in the Court's Order on Motion for Default Final Judgment, ECF No. [67], the Court finds in favor of Plaintiff on Count I, Defamation.

2. Plaintiff Emin Gün Sirer is entitled to judgment in his favor against Defendant Emre Aksoy in the amount of **$3,081,681.76. This amount consists of $750,000.00 in general damages, $300,000.00 in special damages, $31,681.76 in prejudgment interest, and $2,000,000.00 in punitive damages**.

---

[6] *Current Judgment Interest Rates*, MYFLORIDACFO, https://www.myfloridacfo.com/division/aa/local-governments/judgement-interest-rates (last visited April 19, 2023).

[7] The Court calculates this number as follows. The number of days between March 9, 2021 and April 28, 2023 is 780 days. The Court inputted the special damages award, the applicable statutory rate of interest, and the elapsed time in units of years into an annual compound interest formula, setting one year as the compounding period, as follows: $300{,}000 \times ((1 + 0.0481)^{780/365} - 1)$, which equals $31,681.76. *See Blackman v. Fla. Dep't of Bus. & Pro. Regul.*, 599 F. App'x 907, 914 n.9 (11th Cir. 2015) (calculating the plaintiff's hypothetical pay using an annual compound interest formula).

Case No. 21-cv-22280-BLOOM/Otazo-Reyes

3.  Final Judgment will be entered by separate Order, in accordance with Rule 58 of

the Federal Rules of Civil Procedure.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 28, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record